Filed 9/10/15  In re Jose Z. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JOSE Z., a Person Coming Under the Juvenile Court Law. | B261718 (Los Angeles County Super. Ct. No. CK89303) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARIA Z., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Marguerite Downing, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Maria Z. (Mother) appeals from the order terminating her parental rights to her then six-year-old son, Jose Z. Mother argues the juvenile court erred in finding the parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) did not apply to the relationship between her and her son. We affirm.

## BACKGROUND

Jose was born when Mother was 14 years old. The identity of Jose's father is not disclosed in the record. When Mother was 16 years old, she gave birth to Natalie R. Natalie's father is Rafael R. This appeal does not concern Natalie.

In 2011, when Jose was two years old and Natalie was one, the Los Angeles County Department of Children and Family Services (DCFS) filed a dependency petition under section 300, subdivisions (a) and (b), alleging Jose and Natalie were at risk of harm based on a history of violent altercations between Mother and Rafael. DCFS did not detain the children from Mother because Mother acknowledged the domestic violence, was willing to accept services, and agreed to keep Rafael out of the family home she shared with the children's maternal grandfather and maternal stepgrandmother. At the August 10, 2011 detention hearing, the juvenile court ordered the children to remain released to Mother so long as Mother resided with the maternal grandparents, immediately enrolled and started participating in domestic violence counseling, and refrained from contact with Rafael except in a therapeutic setting.

At the September 26, 2011 adjudication/disposition hearing, the juvenile court sustained amended allegations under section 300, subdivisions (a) and (b), regarding domestic violence between Mother and Rafael, and declared the children dependents of the court. The court allowed the children to remain with Mother in the home of the maternal grandparents and ordered Mother and Rafael to complete case plans.

In April 2012, when Jose was three and one-half years old and Natalie was 20 months old, DCFS applied to the juvenile court for an order authorizing the children's

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

removal from the family home. DCFS stated in the application, among other things, (1) DCFS and Mother's service providers observed a change in Mother's behavior and believed she might be using drugs, (2) Mother was "lax" in obtaining a mental health assessment of Jose regarding his "aggressive behavior toward mother and Natalie," (3) the apartment Mother and the children shared with the maternal grandparents was "vermin-infested," and (4) Mother failed to attend a team decision meeting with DCFS. The juvenile court issued an order authorizing DCFS to remove the children from the family home. On April 6, 2012, DCFS detained the children and placed them in foster care.

On April 11, 2012, DCFS filed a supplemental dependency petition under section 387, alleging the children were at risk of harm because the family home "was found to be in a filthy, unsanitary and hazardous condition consisting of the home being infested with rats and bed bugs." At the detention hearing, the juvenile court ordered the children to remain detained in foster care, but granted DCFS discretion to release the children to Mother. The court also ordered reunification services and monitored visitation for Mother.

At the June 11, 2012 adjudication/disposition hearing on the supplemental petition, the juvenile court sustained the allegation regarding the condition of the family home. The court modified Mother's case plan to include monitored visitation two times per week, individual counseling to address anger management, weekly random and on-demand drug testing, and an assessment regarding psychotropic medication. The court also continued Rafael's reunification services.

As set forth in DCFS's September 18, 2012 interim review report, DCFS modified Mother's visitation to accommodate her school schedule. Instead of visiting Jose and Natalie twice per week for two hours each visit, Mother was scheduled to visit the children once per week for four hours each visit. In addition to going to school, Mother also worked and attended individual therapy. She was in partial compliance with her case plan, but had missed 10 out of 32 individual therapy sessions, five out of 24

domestic violence classes, and had failed to show for three out of six random drug tests. Mother was "sleeping in the living room of a friend from church."

As stated in DCFS's December 10, 2012 status review report, prior to October 2012, Mother visited Jose and Natalie on a regular weekly basis, but canceled a few visits because she could not arrange transportation. Then, in October 2012, the visits were moved closer to where Mother was living, and Mother attended consistently. The visitation monitor informed DCFS the children enjoyed visits with Mother. Mother played with the children, was affectionate with them, and gave them candy and soda during visits. The monitor believed Mother was "too soft" and did not discipline the children "when they display[ed] bad behavior." The children's foster mother reported Jose "began pre-school in October and ha[d] been doing well academically but his behavior need[ed] improvement." DCFS reported Mother "was dropped" from her individual counseling and domestic violence programs "due to lack of attendance." She missed seven out of 11 random drug tests. She completed a parenting program. DCFS "recommended that mother's services be continued due to mother having regular visitation with her children."

At the December 10, 2012 review hearing, the juvenile court found Mother and Rafael were in partial compliance with their case plans and continued their reunification services. The court ordered DCFS to refer Jose for therapy due to his behavioral issues.

In a June 10, 2013 status review report, DCFS informed the juvenile court four-year-old Jose was diagnosed with fetal alcohol syndrome. Jose received a referral to the Regional Center. The social worker sought Mother's assistance in filling out the Regional Center application packet. Mother did not respond to the social worker's request. After a team decision meeting, the social worker sat with Mother and they filled out the packet together.

Jose's preschool teacher informed DCFS Jose was "doing very well academically and his behavior ha[d] improved greatly from when he first arrived." Jose had been seeing a therapist since January 30, 2013, due to his aggressive and defiant behavior in his foster home. According to Jose's therapist, as reported by DCFS in the June 10, 2013

4

status review report, Jose "describe[d] wishing he could turn himself into a Power Ranger so he could protect his mother and his sister from his father."

Also in the June 10, 2013 report, DCFS explained Mother was not in compliance with her case plan. "She missed almost all of her testing dates," tested positive for methamphetamine on February 4, 2013, did not show proof of any individual counseling sessions or domestic violence classes during the previous six months, and failed to update DCFS with current contact information. Apparently Mother and Father were living together in their own one-bedroom apartment.

Mother regularly attended her weekly visitation with the children, but "only stayed for the full 4 hours allotted to her about 50% of the time." According to the visitation monitor, as reported by DCFS in the June 10, 2013 report, the children enjoyed their visits with Mother. The monitor reported only "minor problems." On one occasion, for example, Mother allowed two-year-old Natalie to apply Mother's makeup to her face and "Natalie's face broke out in a rash." The children's foster mother reported Mother regularly telephoned the children. As set forth in DCFS's report: "[T]he only problem she [the foster mother] reported with the phone calls was that mother would apologize for not making the visit and then she would promise to take them someplace like Chuck E Cheese. She said she told mother best not to make any promises due to uncertainty of being able to follow through."

DCFS recommended the juvenile court terminate reunification services. The juvenile court continued the June 2013 hearing because Mother and Rafael asked to set the matter for a contest regarding termination of reunification services.

As stated in DCFS's July 24, 2013 interim review report, Jose and Natalie were placed in a prospective adoptive home and were doing well. Jose "was very talkative and happy and active in the home" and told the social worker he would rather stay in that home than return to Mother and Father's home. The foster mother reported Mother and Rafael were not calling the children regularly. The visitation monitor reported, during a July 13, 2013 visit with Mother and Rafael, the children "did not want to be left alone with the parents and were clingy to foster father, and asked foster father not to leave

5

them." DCFS reported Mother and Rafael's visitation with the children was inconsistent, with Mother and Rafael often arriving late and canceling visits. DCFS continued to recommend termination of reunification services, stating, "The Department does not believe that there will be a strong bond between the children and the parents in 6 months due to the parents' history of inconsistent visitation." At the July 24, 2013 contested hearing, the juvenile court continued reunification services for Mother and Rafael, finding they were in compliance with their case plans.

DCFS's November 26, 2013 status review report, recommended termination of reunification services, although the social worker acknowledged it was "difficult to make a recommendation" because she was new to the case and had only had one visit with the children and one visit with Mother. Mother and Rafael were visiting the children once a week and had to spend more than four hours on buses to get to and from the visits. Mother reported Jose was upset after one of their Saturday visits and did not want to return to the foster home. He wanted to go home with Mother instead. Mother informed the social worker she was pregnant and expected to deliver in February 2014.

As stated in DCFS's February 18, 2014 interim review report, DCFS moved the children to another prospective adoptive home in December 2013. Mother and Rafael no longer had to travel long distance to visit the children. Notwithstanding that, they continued to be late for visits. DCFS reported: "The mother does not actively play with the children, blaming it on her pregnancy, but instead gives Jose Z[.] her cell phone to play games. The mother paints her 3 year old daughter's nails, while saying, 'let's get sexy.' Basically, the mother, who has just turned 20 years old, displays little maturity or insight, but is well meaning. It took her months to admit (after many denials) that she had used alcohol, heroin, methamphetamines, etc. while pregnant with Jose Z[.] until she learned she was pregnant in the 5th or 6th month." Mother did not follow through with the social worker's request that Mother make an appointment to talk to the fetal alcohol syndrome specialist who had informed DCFS she wanted to meet with Mother. DCFS reported Mother was "very attached to her children and wishe[d] very much to have them

6

returned to her custody." DCFS continued to recommend termination of reunification services.

On February 26, 2014, DCFS filed a new dependency petition under section 300, subdivision (b), alleging Mother and Rafael's newborn daughter, Katie R., was born with a positive toxicology screen for amphetamine and Rafael had failed to protect the baby. The juvenile court detained Katie from Mother and Rafael. This appeal does not concern Katie.

In a last minute information for the court, dated May 21, 2014, DCFS reported Mother and Rafael had visited the children consistently since they were moved to the current adoptive placement, "except for three no shows by the parents." Mother enrolled in a substance abuse program and submitted to a random drug test which was negative. DCFS also informed the juvenile court it had assessed Rafael's home for placement of Natalie and Katie, but did not recommend the children be placed there due to Father's partial compliance with his case plan. The social worker confirmed Mother had moved out of Father's home. DCFS recommended the court terminate reunification services for Jose and Natalie and decline to provide them for Katie.

At the hearing on May 21, 2014, the juvenile court terminated Mother's reunification services as to Jose, and set the matter for a selection and implementation hearing under section 366.26, finding Mother had three years to complete her case plan but had not complied. The court placed Natalie and Katie in Rafael's home, over DCFS's objection, and ordered that Mother's monitored visits not occur at Rafael's home and not be monitored by Rafael. As to Katie, the court sustained the allegations in the dependency petition regarding Mother's methamphetamine/amphetamine use and Rafael's failure to protect Katie.

In an interim review report dated June 25, 2014, DCFS recommended adoption for five-year-old Jose with his current caregivers, and not placement with Rafael and his half siblings. DCFS reported all of Jose's foster parents had informed DCFS that Rafael did not interact much with Jose during visits. Moreover, those present at monitored visits observed "Jose preferred to play on his own during the visits rather than interact with

7

[Rafael] or his mother." Jose's current caregivers were teachers, one of whom specialized in early childhood development. Jose was thriving in their care, academically and behaviorally. The caregivers had educated themselves on fetal alcohol syndrome and had met with the specialist treating Jose for fetal alcohol syndrome.

On July 30, 2014, DCFS obtained an order authorizing removal of Natalie and Katie from Rafael's home. DCFS detained Natalie and Katie in foster care. On August 5, 2014, DCFS filed a supplemental dependency petition under section 387, alleging Rafael had violated court orders by allowing Mother to visit Natalie and Katie and have unlimited access to Natalie and Katie in his home.

In the September 17, 2014 section 366.26 report for Jose, DCFS made the following comments regarding Mother's visitation with Jose: "Jose has weekly visits with his mother. The visits take place on Saturday for one and a half hours. The visits are monitored by [his] caregivers. Mother is reported to miss generally one visit per month. There are times when she does not call to cancel [a] visit and does not show up. Jose is comfortable with his mother during visits however he is also fine when the visits are over and he goes home. He does not exhibit any problems during transition to and from visits." Jose's caregivers also facilitated weekly visits for Jose and his half siblings.

Regarding the prospect of adoption for Jose, DCFS stated: "It is highly likely that Jose will be adopted. Jose has been residing with his fost-adopt parents since December 2013 and he has developed a strong attachment to both of his caregivers, Ms. L and Ms. W. Jose has stated that he wants to remain in Ms. L and Ms. W's home and that he wants to be adopted by them. Ms. L and Ms. W love Jose as their own child and they wish to adopt him. Ms. L and Ms. W have an approved adoption home study dated 6/20/2013."

In a last minute information for the court dated November 18, 2014, DCFS stated the visitation monitors had reported Mother and Rafael "only hold Katie during their visits and pay little attention to Natalie and Jose." DCFS also reported Mother was five months pregnant and she stated Rafael was the father.

In a status review report dated November 19, 2014, DCFS stated: "During the current period, Jose continues to do extremely well with his current caretakers. Jose is

excelling in school and is getting excellent grades. Jose appears happy and is involved in many after school activities and has many friends. Jose appears to have developed a secure attachment with both of his caregivers, and has verbalized that he would like to stay with them. . . ."

Regarding Mother's visitation, DCFS reported: "Jose visits with mother and his siblings on Saturdays from 10:00 am to 1:00 pm at McDonald's . . . . Visitation with mother, Maria Z[.], has been inconsistent as Ms. Z[.] often misses her visits and when she visits she focuses her attention on the child Katie. Ms. Z[.] makes little or no effort to engage with Jose, and Jose spends most of the time playing in the play structure with other children. The times when mother does not show to the visits, the caregivers have the sibling visits and take the children to a local park or to a restaurant. The caregivers report that Jose has lots of fun and enjoys the sibling visits."

At the December 22, 2014 contested section 366.26 hearing, Mother testified. She stated Jose lived with her for the first three years of his life, either in an apartment she shared with the maternal grandparents or in an apartment she shared with Rafael. Currently, she visited Jose every Saturday for one and one-half hours. Natalie and Katie also attended the visits. Mother denied missing any visits with Jose in the last six months. On cross-examination Mother conceded she had missed visits in the last six months due to "transportation" issues. During visits, Mother, Jose and Natalie would sit together and engage in activities such as arts and crafts. The children seemed to enjoy their visits with her. Mother was aware Jose was "receiving therapy for alcohol syndrome" and at one point had received "therapy for behavior." Mother spoke with one of Jose's therapists who told Mother she could call the therapist if she had any questions.

DCFS's counsel and Jose's counsel urged the juvenile court to terminate Mother's parental rights and select adoption as the permanent plan. Jose's counsel argued: "The child was in the system . . . and out of his mother's care since he was three. [¶] He wishes to remain with his caregivers. This is his home now. [¶] At this point, the benefits to adoption clearly outweigh any incidental benefit. There has been no

consistent contact." DCFS's counsel and Jose's counsel disputed Mother's testimony regarding her consistent visitation with Jose.

Mother's counsel urged the court not to terminate Mother's parental rights, arguing Mother had maintained regular visitation and contact with Jose and wanted to regain custody.[2]

The juvenile court found Mother did not meet her burden of showing the parent-child relationship exception to termination of parental rights applied (or that any other exception applied). The court found Jose was adoptable. The court terminated Mother's parental rights and identified adoption as the permanent plan. The court designated the current caregivers as the prospective adoptive parents.

## DISCUSSION

Mother contends the juvenile court erred in terminating her parental rights because she established the parent-child relationship exception applied to her relationship with Jose.

"At a hearing under section 366.26, the court is required to select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.) When the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the court must terminate parental rights unless the parent opposing termination can show that one of the exceptions set forth in section 366.26, subdivision (c)(1) applies. (*Ibid*.) "Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

---

[2] In addition to arguing the parent-child relationship exception to termination of parental rights applied, Mother's counsel also argued the sibling relationship exception to termination of parental rights applied. On appeal, Mother does not argue the juvenile court erred in finding the sibling relationship exception to termination of parental rights did not apply.

10

"'The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions.'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.) To satisfy the burden of proving the parent-child relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(B), a parent must demonstrate that he or she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The second prong of this exception requires the parent to demonstrate that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Even frequent and loving contact between a child and a parent is not sufficient, by itself, to establish the significant parent-child relationship required under section 366.26, subdivision (c)(1)(B). (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) A "*parental* relationship is necessary for the exception to apply, not merely a friendly or familiar one" because "[i]t would make no sense to forgo adoption in order to preserve parental rights in the absence of a real parental relationship." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The juvenile "'court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) "The factors to be considered include: '(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.'" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)

"Reviewing courts have applied various standards of review when considering trial court determinations of the applicability of these statutory exceptions to termination

11

of parental rights.  In *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, the court observed that both the substantial evidence test and the abuse of discretion test have been applied, and the court stated that '[t]he practical differences between the two standards of review are not significant.  "[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . .  Broad deference must be shown to the trial judge.  The reviewing court should interfere only '"if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did." . . .'"  [Citations.]  However, the abuse of discretion standard is not only traditional for custody determinations, but it also seems a better fit in cases like this one, especially since the statute now requires the juvenile court to find a "compelling reason for determining that termination would be detrimental to the child."  (§ 366.26, subd. (c)(1)[(B)].)  That is a quintessentially discretionary determination.  The juvenile court's opportunity to observe the witnesses and generally get "the feel of the case" warrants a high degree of appellate court deference.  [Citation.]'"  (*In re Scott B.*, *supra*, 188 Cal.App.4th at p. 469.)

Here we review the juvenile court's factual determination—whether a beneficial parent-child relationship exists—under the substantial evidence standard.  (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.)  We review the court's discretionary decision— whether the relationship constitutes a compelling reason for determining termination of parental rights would be detrimental to the child—under the abuse of discretion standard. (*Ibid.*)  Applying these standards, we will not disturb the juvenile court's decision terminating parental rights because Mother did not establish the parent-child relationship exception applied to her relationship with Jose.

Assuming Mother satisfied the first prong of the exception by showing she had maintained regular visitation and contact with Jose, she did not satisfy the second prong of the exception because she did not demonstrate the requisite benefit to Jose from preserving her parental rights and foregoing an adoptive home.

Jose lived with Mother for the first three and one-half years of his life, but had been out of her care for more than two and one-half years at the time of the section

366.26 hearing.  The record is devoid of evidence demonstrating Mother occupied a parental role in Jose's life at the time the juvenile court terminated her parental rights.  Mother consistently failed to assist Jose in obtaining treatment for his behavioral and medical needs.  By all accounts (except her own), Mother and Jose did not interact much during visits.  Instead, Jose played on his own.  There is no indication he looked to Mother as a parental figure.  Jose thrived under the guidance of his caregivers, behaviorally, socially, and academically.  The record establishes Jose looked to his caregivers to fulfill all of his needs and he wanted them to adopt him.  Substantial evidence supports the court's determination a beneficial parent-child relationship did not exist between Mother and Jose.  Thus, the court did not abuse its discretion in terminating Mother's parental rights and freeing Jose for adoption.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


LUI, J.


13